# NOS. 12-07-00429-CR
# 12-07-00430-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *KEVIN MARK BROWN,*<br>*APPELLANT* | § | *APPEAL FROM THE 294TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *VAN ZANDT COUNTY, TEXAS* |

## *OPINION*

Kevin Mark Brown appeals from his two convictions for intoxication manslaughter. Appellant raises six issues on appeal. We affirm.

## BACKGROUND

On April 14, 2004, Appellant's Lincoln Navigator collided with the Honda Accord driven by Amy Beth Anderson on Highway 47, outside of Wills Point, Texas. Appellant was intoxicated, and Anderson was killed. Anderson was pregnant, and her unborn child was also killed. Two individuals saw the events leading up to the wreck. Kirk Burns was working at his welding shop when he saw Appellant's vehicle traveling at a high rate of speed. He did not see the wreck, but he heard it and went to give aid. Justin Nation was following Anderson's vehicle at a distance and observed the wreck. Nation thought the wreck occurred in Appellant's lane, with Anderson having crossed over the center line.

Wills Point police officer Donny Oliver was the first police officer on the scene. The investigation was taken over shortly thereafter by Texas Department of Public Safety Trooper Jason

Matura. Oliver and Matura determined that the wreck had occurred in Anderson's lane and that Appellant was intoxicated.

A Van Zandt County grand jury indicted Appellant for the felony offenses of intoxication manslaughter for the deaths of Anderson and her unborn child. At trial, Appellant presented expert testimony from Gary Jernigan, a mechanical engineer, about the wreck. Jernigan testified that he had conducted a computer simulation of the accident and that the wreck could not have occurred in Anderson's lane of travel. Instead, it was his opinion that Anderson was traveling in Appellant's lane of travel when the collision occurred. The police officers testified that the wreck occurred in Anderson's lane. The jury found Appellant guilty and assessed punishment in each case at imprisonment for ten years and a fine of $7,500. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Appellant argues that the evidence is insufficient to support the verdict. Specifically, he argues that the wreck occurred in his lane and that the accident was Anderson's fault.

### Standard of Review

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979); *Ross v. State*, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004); *Willis v. State*, 192 S.W.3d 585, 592 (Tex. App.–Tyler 2006, pet. ref'd). Evidence is not legally sufficient if, when viewing the evidence in a light most favorable to the verdict, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007).

While legal sufficiency review is all that is required by the U.S. Constitution, the Texas Court of Criminal Appeals has determined that the Texas Constitution requires further review of the factual sufficiency of the evidence. *Clewis v. State*, 922 S.W.2d 126, 129–30 (Tex. Crim. App. 1996). Factual sufficiency review differs from legal sufficiency review only slightly. *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). In a factual sufficiency review, we review the

2

evidence without the light most favorable to the verdict and we are authorized, "albeit to a very limited degree," to disagree with the jury's resolution of contested factual issues. *See id.*; *Watson v. State*, 204 S.W.3d 404, 414, 417 (Tex. Crim. App. 2006). In a review of the factual sufficiency of the evidence, we will conclude that the evidence is insufficient only if the great weight and preponderance of the evidence contradicts the jury's verdict or the verdict is clearly wrong and manifestly unjust. *See Rollerson*, 227 S.W.3d at 724; *Watson*, 204 S.W.3d at 417.

Under either standard, our role is that of appellate review, and the fact finder is the principal judge of the weight and credibility of a witness's testimony. *Wesbrook v. State*, 29 S.W.3d 103, 111–12 (Tex. Crim. App. 2000). The fact finder may choose to believe all, some, or none of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

The State was required to prove that Appellant operated a motor vehicle in a public place, was intoxicated, and, by reason of that intoxication, caused the death of another by accident or mistake. TEX. PENAL CODE ANN. § 49.08(a) (Vernon Supp. 2008).

## Analysis

The central issue in this case at trial, and with respect to the sufficiency of the evidence, is whether the wreck occurred in Appellant's lane of traffic or in Amy Anderson's lane. The only disinterested person who witnessed the wreck testified that it occurred in Appellant's lane, with Anderson having crossed into Appellant's lane. The State attacked this testimony by pointing out that the witness admitted he was adjusting the radio in his car at the time of the wreck and was wrong about the location of the wreck and the striping on the roadway.

The State's evidence as to the location of the wreck came principally from Jason Matura. Matura's conclusion that the wreck occurred in Anderson's lane was based on his evaluation of the resting position of the vehicles as well as the marks made to the roadway by the cars after the collision. Matura testified that there were a number of marks in the roadway that were the result of Anderson's lighter vehicle being compressed onto the roadway at the point of impact. Matura also testified that he could approximate the point of impact based on those markings. Additionally, he testified there were tire marks that were consistent with the collision having occurred in Anderson's lane. Matura's theory was that Appellant was unable, due to his intoxication, to maintain his lane as he began to enter a gentle rightward curve in the roadway. Instead he drifted into Anderson's lane

3

and was attempting to correct back to his lane when he struck Anderson's vehicle in an offset head–on collision. The wreck caused his Lincoln Navigator to roll onto its side and come to rest back in his original lane. Officer Donny Oliver also testified that the wreck occurred in Anderson's lane. He had less training than Matura, but his conclusion was based on the marks in the roadway as well as vehicle fluids he observed in the roadway. He observed the fluids in Anderson's lane, and he theorized that the fluid was discharged at or near the point of impact.

Appellant hired Gary Jernigan of SEAL Corporation in Tyler, Texas to reconstruct the accident. Unlike Matura, who based his conclusions on the physical evidence of the wreck on the roadway, Jernigan used a computer program to simulate the wreck. The computer program accepted a range of inputs including the weights of the vehicles and the physical markers from the scene and allowed Jernigan to manipulate the simulation based on unknown variables, such as the speed of the vehicles. Jernigan concluded, based on his simulation, that the wreck could not have occurred in the way Matura said that it did. Instead, he concluded that the wreck occurred in Appellant's lane with Anderson having crossed over into his lane. Jernigan theorized that the scrapes to the roadway could have occurred some time after the point of initial impact, after the cars had moved into Anderson's lane. He concluded that one of the tire marks relied upon by Matura was not from this wreck at all but a marking that had been on the road prior to the wreck.

There was also the testimony of the eyewitness, who testified that the wreck occurred in Appellant's lane. As the State points out, there were problems with his testimony. Although he testified that Anderson crossed a center line and the lanes were divided only by temporary markers, both sides agreed that his assessment of what happened after the wreck was inaccurate, and the witness was adjusting his radio at the time of the wreck.

Finally, the State called Jeff Wimberly, a Department of Public Safety sergeant, who is Matura's supervisor and who reviewed his report. Wimberly did not do an accident reconstruction, but he had viewed the scene of the wreck and reviewed Matura's work. He concluded that the wreck occurred in Anderson's lane, and that the tire mark was from Anderson's car. He speculated that Jernigan's simulation was wrong because the collision that Jernigan simulated was more of a head–on collision than the physical evidence, that is the wrecked vehicles, indicated. Instead, Wimberly said, the actual wreck was more of an offset head–on, with the left front of Appellant's

4

truck striking the left front of Anderson's car. He also testified that the point of impact was very close to the scrapes and the fluid in the roadway. Those were well into Anderson's lane.

The two sides used different methods to explain what had happened. Both had criticisms of the work of the other side. The resolution of these kinds of issues is primarily for the jury, and a rational jury could have concluded that the wreck occurred in Anderson's lane. We hold that the evidence is legally sufficient to support the verdict.

We also hold that the evidence is factually sufficient. When considering the evidence without the light most favorable to the verdict, we are not persuaded that the evidence is so weak that the verdict is wrong or manifestly unjust. The physical evidence analyzed by the officers working on the case indicates that the wreck occurred in Anderson's lane. Their conclusions drawn from the physical evidence could have been wrong if the troopers inaccurately included roadway markings that were not from this wreck. The simulation done by Appellant's expert shows that the wreck occurred in his lane as does the testimony of the eyewitness. The simulation may have been inaccurate because of an incorrect assessment of how the vehicles met, and the eyewitness may have been mistaken about what he thought he saw. This was a question of fact for the jury, and the jury's resolution of these issues is not clearly wrong or against the great weight and preponderance of the evidence and does not represent a manifest injustice. We overrule Appellant's first and second issues.

### DOUBLE JEOPARDY

In his third issue, Appellant argues that two convictions in this case, one for the manslaughter of Amy Anderson and one for her unborn child, violated the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution.

**Applicable Law**

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution prohibits multiple prosecutions or multiple punishments for the "same offence." *See* U.S. CONST. amend V; *Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008). This case involves a single prosecution and so only the protection against multiple punishment is at issue. *See Villanueva v. State*, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007).

5

Because the legislature has wide ranging authority to set punishment for criminal offenses, the multiple punishments proscription is violated only if a defendant is punished, or at risk of being punished, more times that the legislature intended. *See Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 1436, 63 L. Ed. 2d 715 (1980) (". . . question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized."). The legislature has specifically allowed multiple punishments for each death caused by intoxication manslaughter. *See* TEX. PENAL CODE ANN. § 3.03(b)(1)(A) (Vernon Supp. 2008); *see also Ex parte Rathmell*, 717 S.W.2d 33, 36 (Tex. Crim. App. 1986) (Death of each individual, as defined by statute, resulting from involuntary manslaughter[1] is distinct and separate offense, multiple prosecutions not barred by prohibition against double jeopardy.).

**Analysis**

Appellant does not dispute that the legislature intended to allow multiple punishment for multiple manslaughters. *See Phillips v. State*, 787 S.W.2d 391, 394 (Tex. Crim. App. 1990) ("This Court has consistently held defendants, while operating a motor vehicle and committing an unlawful act, may be convicted for each person injured and/or murdered, in violation of a single statute."). Nor does he challenge the state's prerogative to criminalize the killing of an unborn child. *See* TEX. PENAL CODE ANN. § 1.07(a)(26), (49) (Vernon Supp. 2008) (including unborn children in the definition of "individual" and defining "death" so as to include unborn children who are not born alive). Instead, Appellant argues that his prosecution and punishment for causing the death of the child is not permissible under the specific facts of this case. The specific facts relate to the manner in which the child died. Anderson died from blunt force trauma from the wreck. The wreck did not kill Anderson's unborn child directly, but rather the child died as a result of the mother's dying and not being able to provide oxygenated blood to the child.

Appellant argues that he did only one act, that is cause the death of Anderson, and that the death of the child is, for double jeopardy purposes, a lesser included offense of the manslaughter of

---

[1] The *Rathmell* case involved an intoxicated driver. Intoxication manslaughter was part of the involuntary manslaughter statute prior to its being enacted as a discrete offense in 1993. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 49.08, 1993 Tex. Gen. Laws 3586, 3697.

the mother. This argument is flawed because a double jeopardy analysis does not depend on the number of acts committed. For a time, the Supreme Court focused its double jeopardy analysis on the "same conduct." *See Grady v. Corbin*, 495 U.S. 508, 522–23, 110 S. Ct. 2084, 2094, 109 L. Ed. 2d 548 (1990). But it soon abandoned that standard and reverted to the previous *Blockburger*[2] rule or test, which is a method of gauging legislative intent. *United States v. Dixon*, 509 U.S. 688, 703–04, 113 S. Ct. 2849, 2859–60, 125 L. Ed. 2d 556 (1993); *see also Bigon v. State*, 252 S.W.3d 360, 369 (Tex. Crim. App. 2008).

Under the *Blockburger* test, the elements of the offense as alleged in the indictment are compared to see if the elements of one offense encompass the other. *See Bignon*, 252 S.W.3d at 370. The test for whether one offense is a lesser included offense of the other is similar. A lesser included offense is one that is established by proof of the greater offense, or which differs only with respect to the severity of injury or risk of injury to the same person, or which differs with respect to the culpability of the required mental states or the offender. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006); *Hall v. State*, 225 S.W.3d 524, 535–37 (Tex. Crim. App. 2007). This is important because there is a presumption in Texas that the legislature did not intend multiple punishments for both greater and lesser included offenses. *See Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004).

The court of criminal appeals has held that the *Blockburger* test is not appropriate when two violations of the same statute are being compared. *See Rathmell*, 717 S.W.2d at 35.[3] Instead, a court should use other tools of statutory construction to determine the number of "allowable unit[s] of prosecution" authorized by the facts and the statute. *Id.* In *Rathmell*, the court concluded that each death of an individual, as defined by statute, as a result of involuntary manslaughter was an allowable unit of prosecution. *Id.* at 36; *see also Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006) (For assaultive offenses, each complainant represented one allowable unit of

---

[2] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[3] In *Watson v. State*, 900 S.W.2d 60, 61–62 (Tex. Crim. App. 1995), the court used the *Blockburger* test for two violations of a single controlled substances statute. The two violations were for difference substances, and the court concluded that they were different offenses. *Id.* at 62.

prosecution.).[4] The result is the same under both the ***Blockburger*** analysis or the analysis for lesser included offenses because each offense has an element the other does not, that is, who it was that was killed by Appellant's actions. *See **Phillips***, 787 S.W.2d at 394 ("Rather, each offense requires proof of a fact which the other does not, i.e., the identity of each victim, thus meeting the test established in ***Blockburger***, supra.").

Appellant cites ***State v. Powell***, 671 So.2d 493 (La. Ct. App. 1995), for the proposition that only one conviction is permissible when killing the mother also causes the death of an unborn child. There are two problems with relying on ***Powell*** in this case. The first problem is that Louisiana recognizes broader double jeopardy protections than does Texas. Louisiana uses the ***Blockburger*** test, but also uses the "same evidence" test, which is "somewhat broader in concept than ***Blockburger***, the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct." ***Powell***, 671 So. 2d at 501 (citing ***State v. Steele*** 387 So. 2d 1175, 1177 (La. 1980).[5] Texas does not treat offenses in the same course of conduct or transaction as the "same offence" as a matter of course for double jeopardy purposes, *see, e.g.*, ***Vick v. State***, 991 S.W.2d 830, 834 (Tex. Crim. App. 1999), and the Texas Constitution offers double jeopardy protection that is coextensive with the federal constitution. *See **Stephens v. State***, 806 S.W.2d 812, 815 (Tex. Crim. App. 1990).

The second problem with relying on ***Powell*** relates to how the defendant was charged in that case. He was charged with murder for killing a mother and with feticide for killing her child. *See **Powell***, 671 So. 2d at 501. However, the State charged the defendant with feticide in such a way that the murder of the mother was an element of the feticide offense. ***Id.*** at 501–02. This was not the only way the feticide offense could have been charged, and the way it was charged is akin to a felony

---

[4] In ***Ervin v. State***, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999), the court of criminal appeals set forth a thorough test for whether two offenses that are not the same under ***Blockburger*** may nevertheless be the same offense for double jeopardy purposes. The court concluded, consistent with ***Rathmell***, that the legislature intended one unit of prosecution per death, although in that case it was limiting the number of convictions rather than allowing an additional prosecution.

[5] The Louisiana Supreme Court has recently reiterated that it maintains the "same conduct test." This is similar to the test adopted briefly by the United States Supreme Court in ***Grady v. Corbin***, 495 U.S. 508, 510, 110 S. Ct. 2084, 2087, 109 L. Ed. 2d 548 (1990), and abandoned by ***United States v. Dixon***, 509 U.S. 688, 703–04, 113 S. Ct. 2849, 2859–60, 125 L. Ed. 2d 556 (1993). *See **State v. Williams***, 978 So. 2d 895, 897 (La. 2008).

murder, where the defendant is charged with the murder of an individual that occurs during the commission of another felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2003). Texas law is consistent with **Powell** in that there cannot be a punishment for both felony murder and the underlying felony if the felony murder offense establishes all of the elements of the underlying felony. *See Littrell*, 271 S.W.3d at 277. The case at hand is different because proof of one offense does not establish all of the elements of the other offense.

The closest analogy to Appellant's argument is found in **Patterson v. State**, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004). In that case, the court found a lack of legislative intent to allow multiple punishments for offenses involving the sexual assault of a child where one offense is "demonstrably part of the commission of the greater offense," even though each had an element the other did not. **Id.** We conclude that the legislative intent is different with respect to intoxication manslaughter and unborn children. The court's decision in **Rathmell** has established for more than twenty years that there may be a separate prosecution or penalty for each "individual" killed in a single event of involuntary manslaughter. The legislature was charged with this knowledge when it changed the statute defining an individual to include an unborn child. *See* TEX. GOV'T. CODE ANN. § 311.023(4) (Vernon 2005). Furthermore, the legislature defined an individual in the broadest manner, recognizing unborn life from the moment of fertilization. *See* TEX. PENAL CODE ANN. § 1.07(26). And the legislature exempted intoxication manslaughter from the general rule requiring concurrent punishment for offenses tried in a single proceeding. TEX. PENAL CODE ANN. § 3.03(b)(1)(A).

These statutes are not ambiguous. The breadth of this statute, and the protection it affords, logically anticipates and criminalizes the loss of the life of an unborn child due to the loss of the mother's life. This precise fact pattern might not have been anticipated, but the legislature intended for unborn children to be treated exactly as any other "individual." And it did this in the context of a statutory scheme that permits multiple punishments for every individual killed by an intoxicated driver.[6] There are no grounds on which to conclude that the legislature intended for an unborn child

---

[6] One of the reasons this issue is foreseeable is because of the many problems in applying the preceding regime, which criminalized the killing of children only if they were born alive. *See, e.g.*, **Cuellar v. State**, 957 S.W.2d 134, 137–40 (Tex. App.–Corpus Christi 1997, pet. ref'd) (applying "born alive" rule and surveying cases from around the state and around the country). The application of the "born alive" rule has been troublesome for centuries. *See, e.g.*, 4 William Blackstone, *Commentaries on the Law of England* 198 (The University of Chicago Press 1979) (1769) (discussing presumptions that may be applied and the problems of proof in the instance where a

9

to be treated any differently than any other individual when that child's death is caused by an intoxicated driver. By contrast, on another foreseeable issue,[7] whether a mother could be liable for the death or injury to her own unborn child due to an intoxication assault or manslaughter she committed, the legislature decided that she could not be. *See* TEX. PENAL CODE ANN. § 49.12 (Vernon Supp. 2008).[8]

Accordingly, we conclude that the intoxication manslaughter of Amy Anderson and of her unborn child were not the same offense for double jeopardy purposes and that the legislature intended to allow multiple prosecutions or punishments in cases such as this. We overrule Appellant's third issue.

## TESTIMONY BY POLICE OFFICERS

In his fourth issue, Appellant argues that the trial court erred in allowing Officer Donny Oliver to give nonexpert testimony about the situs of the wreck. In his fifth issue, Appellant argues that the trial court erred in allowing Trooper Jason Matura to testify as an expert witness.

## Applicable Law

Witnesses who are not experts may testify about opinions or inferences, but only when those opinions or inferences are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. TEX. R. EVID. 701. An expert witness may offer an opinion if he is qualified by his knowledge, skill, experience, training, or education to do so and if scientific, technical, or specialized knowledge will assist the trier of fact in understanding the evidence or to determining a fact in issue. TEX. R. EVID. 702. We

---

mother conceals the death of an infant).

[7] The most foreseeable application of this statute is in the context of an abortion of an unborn child. The legislature anticipated the impact this statute could have on abortion, and enacted a law holding that the homicide statutes did not apply to unborn children in the context of "lawful medical procedure[s]," acts of the mother, or lawful dispensations of drugs. *See* TEX. PENAL CODE ANN. § 19.06 (Vernon Supp. 2008).

[8] Appellant's construction of the statutes would allow for multiple prosecutions or punishment when a wreck caused by an intoxicated driver directly kills an unborn child but not when it does so indirectly by killing the mother. The legislature could have made this distinction. However, the result of such a distinction is sufficiently awkward that it supports our holding that the legislature did not intend to differentiate between the various ways an unborn child could be killed.

review the trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. **Kelly v. State**, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992).

An abuse of discretion occurs when the trial court acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. **Montgomery v. State**, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). However, if the trial court's decision to admit or exclude the expert testimony is "within the zone of reasonable disagreement," it does not abuse its discretion. *See **Kelly***, 824 S.W.2d at 574; ***Montgomery***, 810 S.W.2d at 391 (op. on reh'g). We also review a trial court's decision to admit or exclude testimony under rule 701 for abuse of discretion. *See **Osbourn v. State***, 92 S.W.3d 531, 537-38 (Tex. Crim. App. 2002). As the court of criminal appeals has recognized, there is not a "distinct line . . . between lay opinion and expert testimony." *See **id.*** at 537.

**The Testimony**

Donny Oliver was a police officer with the Wills Point Police Department at the time of the wreck. He was not trained to reconstruct accidents, but had received training in investigating accidents. Oliver did not overstate his qualifications. He candidly stated that he had been instructed to secure the scene and wait for a DPS trooper if he was called to a fatality accident. He also testified that in nonfatality accidents, it was his responsibility to attempt to determine who was at fault based on the physical evidence including damage to the roadway or property near the roadway. Oliver had not been disclosed as an expert witness, and Appellant objected to his testimony on the ground that his testimony was expert testimony. The State argued that his testimony would not be expert testimony, but would fall under rule 701, that is nonexpert testimony about what he saw and perceived. The court overruled Appellant's objection, and Oliver offered an opinion that the wreck occurred in Anderson's lane. His opinion was based on his observations of the scene of the wreck including the vehicular fluid on the roadway, gouges in the roadway, and a "debris field" of pieces of the vehicles, all of which appeared to originate in Anderson's lane.

Jason Matura is a trooper employed by the Texas Department of Public Safety. He testified as an expert witness. He testified that he had been employed as a trooper since 2000, that he had been through basic training, and that he attended an 80-hour "level II" accident course. He also completed level III, IV, V, and, VI accident investigation courses, was a member of the crash reconstruction team, and had, at the time of the trial, investigated about 500 accidents including

11

fourteen accidents involving a fatality. He testified that he made a scale diagram of the scene and took photographs. He testified that a more thorough analysis of the speed of the vehicles or a mathematical modeling of the wreck was unnecessary because the physical evidence was sufficient for him to determine how the wreck occurred. Instead, based on his training and experience, he testified that he was able to make that determination based on the gouge marks, skid marks, and other physical evidence. Appellant objected to Matura's testimony on the basis that he was not qualified to give an expert opinion on the wreck. The trial court overruled that objection, and Matura testified that the wreck occurred in Anderson's lane.

**Analysis**

Appellant argues that Oliver and Matura were not qualified to testify as an accident reconstruction experts. But this misperceives their testimony. From the testimony, it is apparent that there are at least two ways to evaluate a wreck after the fact. One is to examine the physical evidence, including the vehicles and the roadway, and attempt to surmise what occurred. The other, which Appellant calls "accident reconstruction," is to mathematically recreate the wreck. A mathematical recreation of a wreck uses the speeds and weights of the vehicles and factors in the coefficient of friction of the relevant surfaces and vehicles to create a model that integrates the physical evidence into a mathematical equation that explains the wreck.

Neither Oliver nor Matura claimed to be qualified to do an accident reconstruction that involved a mathematical recreation of the wreck. Nor did either attempt to do such a reconstruction. Oliver testified based on his first hand observations of the vehicles that came minutes after the wreck. He had training in accident investigation, but he was candid about the limitations of his training. Matura's observations were more precise, and he did much more investigative work than Oliver did.

As the Texarkana court recognized in *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 893–94 (Tex. App.–Texarkana 2004, pet. denied), not every wreck requires expert testimony to explain what occurred. In that case, an officer testified about his conclusions based on interviews of witnesses and observations of skid marks on the roadway. *Id.* at 893. Similarly, Oliver's testimony in this case was rationally based on his perception of the scene of the wreck and was helpful to a clear understanding of his limited testimony on this issue. *See* TEX. R. EVID. 701. His

opinion testimony was essentially based on the premise that the skid marks, damage to the roadway, and debris field would all be arrayed in a consistent or predictable way around the situs of the wreck. Since all of those things were in Anderson's lane—Oliver described a debris field of pieces from the automobiles that was spread like a shotgun blast from where he concluded the impact occurred—Oliver's conclusion was essentially the same as his testimony that those things were all within Anderson's lane.

Testimony as to what Oliver observed is permissible. To the extent his testimony may have crossed over into giving an opinion based on his specialized knowledge, and therefore was expert testimony, we hold that any error was harmless. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Oliver did not profess to have more training and experience than he had, and his conclusions were reiterated by Matura and Wimberly, both of whom had significant training in and experience with investigating automobile wrecks. Accordingly, after examining the record as a whole, we conclude that any error did not influence the jury or had but a slight effect. *See* TEX. R. APP. P. 44.2(b).

Matura's testimony was more detailed. He reached the same essential conclusion that Oliver did, but he did more backchecking in terms of compiling measurements of many of the important features of the roadway and the evidence left behind. He also drafted a report, talked to witnesses, and prepared a map. He did not do a mathematical model of the wreck, but his testimony demonstrates that he was qualified to do the kind of analysis he did in this case. Some of his testimony may have been rationally based on his observations, pursuant to rule 701, and some of it required the kind of specialized technical knowledge contemplated by rule 702.

Appellant argues, without citation to authority, that "accident reconstruction is the means by which the cause of accident is determined," and that since Matura did not do an accident reconstruction, his opinion should not have been admitted. We disagree. Appellant does not cite, and we have not found, authority for the proposition that a formal accident reconstruction, by which Appellant means a mathematical modeling of the accident, is the only way to determine the cause of an accident. Matura demonstrated that he was qualified to give the kind of opinion he gave, which was an opinion of how the wreck occurred based on his observation of the scene of the wreck and subsequent investigation. The trial court did not err by allowing him to testify as an expert or to

offer an opinion as to how the wreck occurred. We overrule Appellant's fourth and fifth issues.

## JURY INSTRUCTION

In his sixth issue, Appellant argues that criminally negligent homicide is a lesser included offense of intoxication manslaughter and the trial court erred by not instructing the jury that it could find him guilty of the lesser offense. Appellant does not argue that criminally negligent homicide is a lesser included offense of intoxication manslaughter in every case, and indeed it is not. *See Wooten v. State*, 267 S.W.3d 289, 304–05 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd) (criminally negligent homicide not a lesser included offense of intoxication manslaughter). Instead, Appellant argues that it is a lesser included offense under the facts of this case because of the way the indictment alleges the offense. We disagree.

The first step in assessing whether one offense is included in another is to look to the statutory elements and facts, as pleaded in the indictment, to see if the elements of the lesser offense are pleaded in the indictment. *Hall*, 225 S.W.3d at 536. The indictment in this case alleges that Appellant operated a motor vehicle while intoxicated and caused the death of Amy Anderson and her unborn child by "accident or mistake, to-wit: by crossing over into the lane of traffic that Amy Beth Anderson was driving in and causing the motor vehicle he was driving and operating to collide with the motor vehicle Amy Beth Anderson was driving and operating. . . ." A person commits criminally negligent homicide if he "causes the death of an individual by criminal negligence." TEX. PENAL CODE ANN. § 19.05 (Vernon 2003).

Appellant argues that the jury could have concluded that he was not intoxicated but that he acted with criminal negligence by crossing into Anderson's lane of traffic. But it was not alleged in the indictment that he acted with criminal negligence. The indictment alleged that he caused Anderson's death and the death of her child, but it did not allege, either explicitly or implicitly, that he acted with criminal negligence. This is appropriate because intoxication manslaughter is a strict liability offense. *See Wooten*, 267 S.W.3d at 305. Accordingly, under the cognate pleadings test articulated in *Hall*, the trial court did not err in refusing to give the requested instruction because criminally negligent homicide was not established by proof of the same or less than all the elements and facts required to prove the commission of the offense charged. *See Hall*, 225 S.W.3d at 536.

14

We overrule Appellant's sixth issue.

## DISPOSITION

Having overruled Appellant's six issues, we *affirm* the judgment of the trial court.

   SAM GRIFFITH   
Justice

Opinion delivered March 31, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)